UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TENNESSEE
AT WINCHESTER

VICKI D. STONE,                        )    No. 4:08-cv-25
                                       )
              Plaintiff,               )    (Mattice/Carter)
       v.                              )
                                       )
MICHAEL J. ASTRUE,                     )
COMMISSIONER OF                        )
SOCIAL SECURITY,                       )
                                       )
              Defendant.               )

REPORT AND RECOMMENDATION

This action was instituted pursuant to 42 U.S.C. §§ 405 (g) and 1383(c)(3) seeking judicial

review of the final decision of the Commissioner of Social Security denying the plaintiff

supplemental security income under Title XVI of the Social Security Act.

This matter has been referred to the undersigned pursuant to 28 U.S.C. § 636(b) and Rule

72(b) of the Federal Rules of Civil Procedure for a Report and Recommendation regarding the

disposition of:

(1)     The plaintiff's motion for summary judgment (Doc. 17).

(2)     The defendant's motion for summary judgment (Doc. 19).

For the reasons stated herein, I RECOMMEND the decision of the Commissioner

be AFFIRMED.

Plaintiff's Age, Education, and Past Relevant Work Experience

Plaintiff, 47 years old on the date of the ALJ's decision, was considered a "younger

individual"[1] (Tr. 22, 777). 20 C.F.R. § 416.963. She completed the 8th grade and had no past

relevant work experience (Tr. 115, 132, 781). She indicated that she could speak, read, and write

more than her name in English (Tr. 160, 780).

Applications for Benefits

Plaintiff protectively filed an application for Supplemental Security Income (SSI) on

April 26, 2004, alleging disability since November 15, 2003, due to depression and a lump in her

breast (Tr. 103-06, 160-69).[2] Plaintiff's application was denied initially and on reconsideration

(Tr. 43-44, 52-55, 58-59). On October 17, 2006, Plaintiff appeared with her attorney and

testified at a hearing before an administrative law judge (ALJ) (Tr. 60, 773-797). Joann Bullard,

a VE, also testified (Tr. 68, 792). A supplemental hearing was held on April 26, 2007, and

Plaintiff appeared with her attorney and testified along with Jane Hall, another VE (Tr. 69, 798-

816). On June 8, 2007, the ALJ found that Plaintiff retained the RFC to perform work at all

exertion levels (Tr. 19). The ALJ found that Plaintiff had marginal literacy with mild impairment

of activities of daily living, and she required only occasional assistance with daily living tasks;

she had mild limitation in social withdrawal; she had moderate difficulty adapting to change, and

therefore could do no complex work or work requiring frequent changes; and, due to reduced

hearing, she could not perform jobs where good speech and hearing were required (Tr. 19-20).

The ALJ found that, based on such RFC, Plaintiff could perform a significant number of jobs in

the economy and thus, was not disabled (Tr. 23). On December 28, 2007, the Appeals Council

---

[1]Although some records indicated a different birth date for Plaintiff, she clarified her birth date at the hearing, and stated that the other birth date was that of her husband (Tr. 777-78).

[2]Plaintiff previously filed applications for SSI in May 2001 and July 2003, which were denied initially in September 2001 and October 2003, respectively (Tr. 39-41, 45-49, 87-99).

denied review of the ALJ's decision, making the ALJ's decision the final decision of the Commissioner (Tr. 6-8). 20 C.F.R. § 416.1481. Plaintiff seeks judicial review under 42 U.S.C. § 405(g).

## Standard of Review - Findings of ALJ

Disability is defined as the inability to engage in any substantial gainful activity by reason of a medically determinable physical or mental impairment that has lasted or can be expected to last for a continuous period of not less than 12 months. 42 U.S.C. § 423(d)(1)(A). The burden of proof in a claim for social security benefits is upon the claimant to show disability. *Barney v. Sec'y of Health & Human Servs.*, 743 F.2d 448, 449 (6th Cir. 1984); *Allen v. Califano*, 613 F.2d 139, 145 (6th Cir. 1980); *Hephner v. Mathews*, 574 F.2d 359, 361 (6th Cir. 1978). Once the claimant makes a prima facie case that she cannot return to her former occupation, however, the burden shifts to the Commissioner to show that there is work in the national economy which claimant can perform considering her age, education, and work experience. *Richardson v. Sec'y of Health & Human Servs.*, 735 F.2d 962, 964 (6th Cir. 1984); *Noe v. Weinberger*, 512 F.2d 588, 595 (6th Cir. 1975). "This Court must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record." *Warner v. Comm'r of Soc. Sec.*, 375 F.3d 387, 390 (6th Cir. 2004) (quoting *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997)). If there is substantial evidence to support the Commissioner's findings, they should be affirmed, even if the Court might have decided facts differently, or if substantial evidence also would have supported other findings. *Smith v. Chater*, 99 F.3d 780, 782 (6th Cir. 1996); *Ross v. Richardson*, 440 F.2d 690, 691 (6th Cir. 1971). The Court may not re-weigh the

3

evidence and substitute its own judgment for that of the Commissioner merely because substantial evidence exists in the record to support a different conclusion. The substantial evidence standard allows considerable latitude to administrative decision makers because it presupposes there is a zone of choice within which the decision makers can go either way, without interference by the courts. *Felisky v. Bowen*, 35 F.3d 1027, 1035 (6th Cir. 1994) (citing *Mullen v. Bowen*, 800 F.2d 535, 548 (6th Cir. 1986)); *Crisp v. Sec'y of Health & Human Servs.*, 790 F.2d 450, 453 n.4 (6th Cir. 1986).

As the basis of the administrative decision of June 8, 2007, that plaintiff was not disabled, the ALJ made the following findings:

1. The claimant has not engaged in substantial gainful activity since November 15, 2003, the alleged onset date (20 CFR 416.920(b) and 416.971 *et seq.*).

2. The claimant has no severe physical impairments. However, she does have PTSD, mild cognitive impairment with borderline intellectual functioning, a personality disorder, and a mood disorder with a GAF of 60.

3. The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 416.920(d), 416.925 and 416.926).

4. After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform the wide world of exertion. The claimant has marginal literacy with only mild impairment of activities of daily living; requires only occasional assistance with daily living tasks; has only mild limitation in social withdrawal; moderate difficulty adapting to change thus no complex work or work requiring frequent changes. Due to reduced hearing, the claimant cannot perform jobs where good speech and hearing is required.

5. The claimant has no past relevant work (20 CFR 416.965).

6.     The claimant was born on March 8, 1954 and was 50 years old, which is defined as an individual closely approaching advanced age on the date the application was filed (20 CFR 416.963).

7.     The claimant has a marginal education and is able to communicate in English (20 CFR 416.964).

8.     Transferability of job skills is not an issue because the claimant does not have past relevant work (20 CFR 416.968).

9.     Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 416.960c) and 416.966.

10.    The Claimant has not been under a disability, as defined in the Social Security Act, since April 26, 2004, the date the application was filed (20 CFR 416.920(g)).

Review of Evidence

Reports and Testimony

In May 2004, Plaintiff reported she slept all day and was nervous all the time (Tr. 179). She did not perform any household duties (Tr. 181). Her husband helped her with personal grooming (Tr. 180). Her daughter–in-law helped her to prepare meals sometimes (Tr. 180). If Plaintiff prepared the meal herself, it took her an hour (Tr. 180). She did not like to be around a lot of people, and she had problems concentrating (Tr. 182-83).

At the October 2006 hearing, Plaintiff testified that she lived in an apartment with her husband and one of her two adult sons (Tr. 779). She read "a little bit[,]" but had problems reading stories in a newspaper (Tr. 780). She could write her name and Social Security number, but "that's about it." (Tr. 780). She had worked at McDonald's for three or four months in 1994 and as a waitress at Pizza Hut for about one month in 2002 (Tr. 781).

5

She claimed that she was anxious and could not stand to be around a lot of people (Tr. 787-788). She visited with her neighbor sometimes (Tr. 788). She heard the voices of her deceased mother and father (Tr. 789). They told her she would "be alright" (Tr. 789). Her mother died in November 2003 (Tr. 789).

Plaintiff sought mental health care for depression (Tr. 782). She claimed that her depression had worsened since seeking help, because she spent time thinking about her father and not being able to spend time with her mother prior to her death (Tr. 782).

Plaintiff indicated that she had a hearing problem for about 2 years (Tr. 791). Twice a week, she had migraine headaches that lasted all day long (Tr. 785-86). She had not seen a doctor for her headaches, because she had no insurance (Tr. 787). She claimed that she had chronic obstructive pulmonary disease (COPD) and emphysema and could only walk 5 or 6 steps and had to stop and rest (Tr. 787). Leg pain also affected her ability to walk (Tr. 787).

On a normal day, Plaintiff slept all day (Tr. 784). Her husband took care of her, did the housework, cooked, and went to the grocery store (Tr. 784). She had a driver's license, and drove once in a while (Tr. 785). She took Seroquel at night, and it put her in the "twilight zone" (Tr. 785).

At the supplemental hearing, Plaintiff stated that she had problems walking due to leg and back pain, and she could walk about 2 to 5 feet (Tr. 804). She also experienced shortness of breath (Tr. 804). She stated that she had not done any housework on her own since 2003, when her mother died (Tr. 805). She stated that her mother's death was very hard on her, and she had sought treatment for depression, mood swings, and anxiety after that (Tr. 805). She claimed that she experienced auditory or visual hallucinations every other day (Tr. 806).

6

Medical Evidence

Between 1992 and 2004, Plaintiff went to the emergency room (ER) for various complaints including abdominal pain, epigastric pain and discomfort, chest pain, and back pain (Tr. 361- 519).

In May 2001, Plaintiff sought treatment from Dr. Allen, an otolaryngologist, for hearing loss (Tr. 245-46, 300). She was diagnosed with bilateral E-tube dysfunction with scarring and retraction pockets with conductive hearing loss and flat tympanograms, and subsequently underwent surgery (Tr. 245-46, 263). Post-operatively, she was described as "doing well" (Tr. 245).

On May 29, 2003, mammograms showed evidence of some benign calcifications in the left breast (Tr. 523). On April 13, 2004, it was noted that Plaintiff had a density in the left breast, but it was smaller than previously noted a year ago, and if felt like it was most likely a fibroadenoma (benign breast tumor) (Tr. 291). The doctor decided not to do a biopsy (Tr. 291).

On April 6, 2004, Dr. Battles, M.D., performed a psychiatric examination (Tr. 770-72). Plaintiff reported a history of abuse by her brother and father from age 5 to 13, set out in more detail in the transcript (Tr. 772). Currently, Plaintiff reported flashbacks of her deceased mother and of the abuse (Tr. 772). She reported trouble sleeping (Tr. 772). She stated that she had never been on any medication for psychiatric reasons (Tr. 772). Plaintiff denied any significant medical problems, but noted a breast mass that apparently was cystic fibrosis of the breast (Tr. 772). On mental status examinations, Plaintiff's speech pattern was normal; there was no evidence of looseness of association or flight of ideas; there was no evidence of hallucinations or delusions; her mood was dysphoric and affect was flat; she was oriented; her memory was intact

7

for recent and remote events, although the abuse was difficult for her to discuss; her intelligence was average; and her insight and judgment were limited (Tr. 770). Dr. Battles diagnosed post traumatic stress disorder (PTSD), secondary to severe abuse; dysthymia; depression; and personality disorder, not otherwise specified; and he assessed a Global Assessment of Functioning (GAF) score of 50[3], and a GAF of 60 in the past (Tr. 770). He prescribed Lexapro and Seroquel, and counseling (Tr. 770).

On May 5, 2004 and May 28, 2004, Dr. Battles reported that Plaintiff was stable and improved, but remained symptomatic (Tr. 768-769).

On August 10, 2004, Dr. Long, a psychologist, performed a consultative evaluation of Plaintiff (Tr. 265). Plaintiff alleged disability due to depression and a lump in her left breast (Tr. 265). She took medication for her nerves (Diazepam), sleep (Trazadone), and depression (Paxil CR); she stated that her medication made her dizzy (Tr. 265, 269). Plaintiff indicated that she dropped out of school in the 8th grade, due to family problems, and had been in a combination of regular and special classes (Tr. 266). On examination, Plaintiff was alert, coherent, and aware of her situation and circumstances (Tr. 266). She struggled somewhat with general knowledge type questions (Tr. 266). Plaintiff reported abuse over many years (set out in the record more specifically) which was the basis for a lot of her problems (Tr. 266, 268). Plaintiff did not sleep well and was afraid to be in crowds of people (Tr. 266). She lived with her disabled husband (Tr. 266-67). She did some cleaning, cooking, and helped around the house (Tr. 266-67). She helped

---

[3] A GAF score of 41-50 is indicative of serious symptoms or any serious impairment in social, occupational, or school functioning. American Psychiatric Ass'n., *Diagnostic and Statistical Manual of Mental Disorders* 34 (4th ed. Text Revision 2000). A GAF score of 51-60 is indicative of moderate symptoms or any moderate difficulty in social, occupational, or school functioning. *Id.*

8

her disabled husband (Tr. 267). She could drive, and she and her husband shopped at the local stores (Tr. 267). On the Wechsler Adult Intelligence Scale-III (WAIS-III), Plaintiff had a verbal IQ score of 57, a full scale IQ score of 54, and a performance IQ score of 59 (Tr. 267). Plaintiff's performance on achievement tests was in the deficient range for reading, writing, spelling, and arithmetic (Tr. 267). Dr. Long determined that, although these scores coincided closely with Plaintiff's overall performance on the WAIS-III, it was an under-estimation (Tr. 267). He noted that Plaintiff had worked with fast foods, had a driver's license, and could drive (Tr. 267). Dr. Long reported that Plaintiff's responses on testing indicated major problems with motivation and effort, and Plaintiff scored in the malingering range (Tr. 268). Dr. Long reported that Plaintiff was a slow learner and always had been but that she may not have been quite as restricted as she tried to project (Tr. 267). He diagnosed mixed moods secondary to physical/finances/life, PTSD, mental deficiency-mild, and personality pattern-avoidant/dependent (Tr. 268).

On September 15, 2004, Dr. VanderPlate, a state agency psychologist, reviewed the record and determined that, despite her borderline intellectual functioning and mixed mood disorder, Plaintiff had the ability to understand and remember at least simple instructions and carry out simple tasks with adequate concentration, although her pace may be slower (Tr. 273). She could relate appropriately to others, and her adaptive skills were intact (Tr. 273). In forming his opinion, Dr. VanderPlate considered Plaintiff's work history as a waitress, her ability to read and write, as well as her consultative examination with Dr. Long (Tr. 273, 287).

Between December 2004 and December 2005, Plaintiff received treatment from Dr. Teresa Buck for complaints of coughing, body ache, lower back pain, and headaches (Tr. 529-30, 532-42). She was treated with prescription medication, breathing treatments and inhalers, and

9

she was advised to stop smoking (Tr. 529-30, 532-42).  In December 2005, Plaintiff went to the ER for cough, sharp chest pain, and shortness of breath (Tr. 567).  She was diagnosed with pneumonia (Tr. 568).  In April 2006, Plaintiff sought treatment for pain in her back, left ribs, and right forearm after falling and for pain with breathing (Tr. 696-697 ).  X-rays revealed no evidence of fracture (Tr. 700).  The doctor prescribed Lortab and told plaintiff to follow up with her regular doctor (Tr. 696).

On June 4, 2006, Plaintiff was admitted to the hospital for breathing problems due to pneumonia and COPD (Tr. 707).  She was treated with oxygen and medication (Tr. 707).  She improved and was and discharged on June 11, 2006, on Levaquin, Augmentin, and Singulair and told to continue her previous medications (Tr. 707).  She was advised to stop smoking and follow up with her primary care physician (Tr. 707).

Plaintiff received counseling and medication management  at the Volunteer Behavioral Health Care System (VBHCS) from November 2004 to September 2006 (Tr. 614-88, 735-43). At her initial assessment, Plaintiff stated that she had been depressed for about a year due to her mother dying (Tr. 684).  She reported that she had been abused by her father and two brothers when she was a child (Tr. 684).  She claimed she had experienced auditory hallucinations for years (Tr. 684).  She took Trazadone, Valium, and Paxil, which she stated helped her anxiety, but she was still depressed and tired all the time (Tr. 684).  At night, she had racing thoughts and could not sleep (Tr. 684).  She also experienced mood swings (Tr. 684).  She was diagnosed with major depressive disorder and panic disorder with agoraphobia and assessed with a GAF score of 55 (Tr. 687-88).  She was noted to have mild limitations in activities of daily living, a moderate degree of social isolation and withdrawal, moderate limitations on concentration, task

10

performance, and pace, and moderate limitations in adaptation to change (Tr. 689-90). Plaintiff

began therapy, with her treatment goals including decreasing her level of depression and anxiety

(Tr. 683).

In December 2004, Plaintiff reported problems with mood swings and anger and

continued depression (Tr. 679). Plaintiff's medications were adjusted, with Seroquel being

added (Tr. 680). In a counseling note from January 2005, Plaintiff reported having panic attacks;

she stated that she "plays on the computer and does not go out" (Tr. 676). She also noted that

she continued to hear voices and see things (Tr. 674, 671).

In February 2005, Plaintiff expressed interest in getting her GED (Tr. 669). She reported

that she heard voices less frequently, only once a week now (Tr. 662). In March 2005, she

indicated that the voices were back to "all the time" (Tr. 658). In a report from April 15, 2005,

Plaintiff stated that she enjoyed walking, but seldom went because she had no one to walk with

and the neighborhood had safety issues (Tr. 657). She still had not called regarding GED classes

(Tr. 657). On April 19, 2005, Plaintiff indicated that she had a lot of stress relating to familial

issues (Tr. 655). Plaintiff's GAF was assessed to be 60, and the report indicated that progress

was being made (Tr. 656).

In May 2005, Plaintiff reported financial and marital problems (Tr. 653). Also in May,

Plaintiff was encouraged to walk indoors at the mall and was provided with transportation, but

chose not to participate on various occasions, at times because she did not feel well (Tr. 640,

645-47).

Reports from June, August, September, November 2005 and January, February, May,

June, and September 2006 indicate that Plaintiff was assessed with a GAF of 60 and that

11

progress was being made towards her goals (Tr. 616, 619, 627, 629, 631, 636, 643, 739, 742, 737).  In June 2005, Plaintiff reported financial difficulties (Tr. 646).  In July 2005, Plaintiff's husband was hospitalized with heart problems, and Plaintiff was caring for him (Tr. 639).  He was hospitalized again in August 2005 (Tr. 634).

In September 2005, Plaintiff was depressed in relation to her mother-in-law dying the past week (Tr. 630).  It was noted that Plaintiff's level of depression was not congruent with her rating of 9 on a scale of 0 to 10 (Tr. 630).  She stated she was not having any hallucinations or anger issues (Tr. 630).  Again in November, it was noted that Plaintiff's level of depression did not appear to be as significant as she claimed - a 9 on a scale of 0 to 10 (Tr. 626).

In November 2005, it was reported that Plaintiff had mild limitations in activities of daily living, a moderate degree of social isolation and withdrawal, moderate limitations on concentration, task performance, and pace, and moderate limitations in adaptation to change (Tr. 689-90).

In June 2006, it was noted that Plaintiff gave no indication of significant depression, but when asked about it, she rated it at a 9 on a scale of 0 to 10 (Tr. 738).  In an assessment from September 2006, it was reported that Plaintiff had mild limitations in performing her daily activities, mild limitation in social interaction, mild limitation in concentration, task performance, and pace, and moderate limitation in the ability to adapt to changes in her life (Tr. 732-33).  It was noted that Plaintiff had previously been severely impaired, but was not currently, and she continued to require mental health therapy in order not to suffer a relapse (Tr. 734).

On November 30, 2006, Stephen Hardison, M.A., a psychologist, performed a consultative examination (Tr. 744).  Plaintiff told Mr. Hardison that she had a 99% hearing loss

in her left ear and had problems with depression and nerves (Tr. 744-45). She reported good

relations with her family and indicated that she tended to get angry rather easily (Tr. 745). She

heard voices of her deceased parents talking to her (Tr. 745). She was taking Seroquel (Tr. 745).

During the day, she typically sat and watched television; "she will play with the ball which she

reportedly will throw up in the air and it 'opens up;'" she claimed that she did no chores – her

husband did all of those; she did not cook or wash clothes; she occasionally drove; and she went

to medical appointments (Tr. 746). On WAIS-III testing, Plaintiff had a verbal IQ of 56, a

performance IQ of 64, and a full scale IQ of 54 (Tr. 746-47). Mr. Hardison reported that Plaintiff

had some degree of cognitive limitations; however, these results were likely an under-

representation of her true functioning (Tr. 744, 747-48). He reported that Plaintiff's effort was

"quite questionable" and "she tended to respond to questions on intelligence testing very quickly

without getting (sic) much thought" (Tr. 744). WRAT-3 testing revealed limited reading skills

and math skills (Tr. 747). Validity profile testing suggested that Plaintiff likely exaggerated her

symptoms (Tr. 748).

On mental status examination, Plaintiff was alert and able to give her date of birth as well

as the current date; she knew her age; and she appeared to have some limitations with

concentration and attention skills (Tr. 748). Mr. Hardison diagnosed anxiety disorder, not

otherwise specified, and malingering (Tr. 749). He concluded that Plaintiff had the ability to

remember and carry out very basic one- and two-step instructions with no significant difficulties;

her ability to remember and carry out somewhat more detailed instructions would be mildly

limited; her ability to sustain concentration could be mildly, or possibly moderately, limited

under stress; her social interaction skills appeared mildly, to possibly moderately, limited as she

reported some history of anger outburst; and her ability to respond appropriately to changes in routine work setting including being aware of, or taking appropriate precautions regarding, normal hazards was not significantly limited (Tr. 749). Her ability to set realistic goals and make plans independently would be mildly limited; she appeared to have some degree of cognitive limitations and some emotional-related difficulties with some mixed anxiety and depressive symptoms (Tr. 749). Although she had adequate understanding of very basic business transactions, she may need some assistance using proper judgment regarding disbursement of funds (Tr. 749). Mr. Hardison also completed a medical source statement of ability to do work-related activities (Tr. 751-53). He opined that Plaintiff's level of limitation was "slight" (there is some mild limitation in this area, but the individual can generally function well) to "none" (absent or minimal limitations) in her ability to understand, remember, and carry out short, simple instructions; understand, remember, and carry out detailed instructions; make judgments on simple work-related decisions; interact appropriately with the public, supervisors, and co-workers, respond appropriately to work pressures in a usual work setting, and respond appropriately to changes in a routine work setting (Tr. 751-52). He noted no other capabilities affected by Plaintiff's impairment (Tr. 752).

Treatment records from October 2006 to March 2007 from VBHCS show that Plaintiff's GAF during this period ranged from 56 to 60, and she continued to make progress toward her goals, despite her depression which was related to her husband's failing health and not being able to see her granddaughter and despite claiming she lost her temper every day and had auditory and visual hallucinations of her deceased parents (Tr. 754-64).

14

<u>Vocational Expert Testimony</u>

Ms. Bullard, a VE, testified at the first hearing (Tr. 792). The ALJ asked the VE to assume an individual of Plaintiff's age who had marginal literacy, and who had no past relevant work experience (Tr. 793). The individual had PTSD, a mild cognitive impairment with an estimate of borderline intellectual functioning, a personality disorder, a mood disorder, and a GAF of 60 (Tr. 793). She had a mild impairment of daily activities, a mild impairment of concentration, and a mild impairment of her ability to function socially (Tr. 793). She had moderate difficulties adapting to changes and could not perform complex work or work requiring frequent changes in the work environment, in her duties, or in the environment in which she works (Tr. 793-94). Also, due to reduced hearing and slight speech impediment, she could not perform jobs where good communication orally, meaning speech or hearing, was required (Tr. 794). She had no other physical limitations (Tr. 793-74). The VE testified that the individual could perform medium exertion, unskilled jobs as a hand packager, industrial cleaner, and machine cleaner (Tr. 794). There were 26,075 such jobs in the state and over a million in the nation (Tr. 794).

If Plaintiff's testimony concerning the extent of her limitations was accepted, the VE testified she could not perform any jobs (Tr. 794). The VE testified that a mild breathing impairment would not change the job base she described (Tr. 795-96).

At the supplemental hearing, Ms. Hall testified as a VE (Tr. 809). The ALJ asked her the same hypothetical question as indicated at the prior hearing, and Ms. Hall testified that, at the medium exertion level, the individual could perform work as a dishwasher, cleaner, and production worker (Tr. 811). There were 76,400 jobs in the state and over 800,000 jobs in the

15

nation (Tr. 811).  The following exchange also took place:

> ALJ: The, when she was tested at one point she had an IQ verbal 56, performance 94 on the point scale, 54, so and there had been some suggestion that they may be an under estimate.  We don't, you know, there's some issue about that obviously.  But it was in, in that general range, you know, where that was less than the borderline range and I think you could certainly tell us whether you have placed, or are aware of people being placed in competitive work situations with an IQ in the range of 60 to 69 with about an IQ in that range.  Do those people do competitive work?

> VE: Traditionally not, not so.  They only do work with some kind of job coach or a job placement assistance with follow up.  So, therefore, if there, we base this on the IQ range with the overall score of 54, normally an individual such as this would not be able to compete and maintain a job at competitive employment.

(Tr. 813-14).

## Issues Raised

Plaintiff raises two issues:

1.  Whether substantial evidence supports the ALJ's credibility and residual functional capacity (RFC) findings.

2.  Whether substantial evidence supports the ALJ's finding that Plaintiff could perform a significant number of jobs in the economy.


## Analysis

1.  Plaintiff first argues the ALJ's Residual Functional Capacity assessment was not supported by substantial evidence.  Plaintiff's argument focuses on two areas: 1) Plaintiff's mental limitations and 2) the ALJ credibility assessment (Doc 18, Plaintiff's Brief pp. 9-17).

The ALJ considered Plaintiff's allegations that she was incapable of work; however, based on the record as a whole, the ALJ found that Plaintiff's impairments did not preclude her from performing all work activity.  The ALJ found that Plaintiff had marginal literacy; she had mild impairment of activities of daily living and required only occasional assistance with daily

16

living tasks; she had only mild limitation in social withdrawal; she had moderate difficulty

adapting to change, and therefore could not do complex work or work requiring frequent

changes; and, due to reduced hearing, she could not perform jobs where good speech and hearing

were required (Tr. 19-20).

Plaintiff contends that the ALJ's mental RFC finding is not based on substantial

evidence[4] (Doc. 18, Plaintiff's Brief at 9-17). She asserts that the ALJ selectively cited to

evidence that supported his conclusion, but excluded evidence showing that Plaintiff had greater

limitations (Doc. 18, Plaintiff's Brief at 1-12). Plaintiff cites to various excerpts from

consultative examiner Mr. Hardison's report, including IQ testing, to support her contention that

she had greater limitations (Doc. 18, Plaintiff's Brief at 12-14). Although the ALJ did not

expressly set forth all of the excerpts from Mr. Hardison's report cited by Plaintiff, this does not

mean that the ALJ ignored such evidence. As the Commissioner argues, an ALJ is not required

to discuss each and every piece of evidence. *Walker v. Sec'y of Health & Human Servs.*, 884

F.2d 241, 245 (6th Cir. 1989) (Secretary need not address every piece of evidence in the record);

*Johansen v. Barnhart*, 314 F.3d 283, 287 (7th Cir. 2002) ("Though the ALJ need not address

every piece of evidence, he must articulate, at some minimum level, his analysis of the record so

that the reviewing court can follow his reasoning."). It is clear from his decision that the ALJ

considered Mr. Hardison's November 2006 report (Tr. 19-20). In fact, the ALJ considered that

Mr. Hardison reported that Plaintiff appeared to have some degree of cognitive limitation based

on IQ testing, but he indicated that the test results were likely an under representation of her true

---

[4]Plaintiff does not allege any error regarding the ALJ's consideration of her physical impairments. Therefore, she has waived her right to raise this issue. *See Willis v. Sullivan*, 931 F.2d 390, 401 (6th Cir. 1991) (waiver of issue not raised in district court brief).

functioning as she did not have to put forth much effort or thought when performing the tasks (Tr. 19, 744). Further, Dr. Hardison reported the validity profile testing suggested that Plaintiff very likely exaggerated symptoms (Tr. 748). Based on the results of his evaluation and testing, Mr. Hardison opined that Plaintiff had "slight" (there is some mild limitation in this area, but the individual can generally function well) to "none" (absent or minimal limitations) limitation in her ability to understand, remember, and carry out short, simple instructions; understand, remember, and carry out detailed instructions; make judgments on simple work-related decisions; interact appropriately with the public, supervisors, and co-workers, respond appropriately to work pressures in a usual work setting, and respond appropriately to changes in a routine work setting (Tr. 751-52). He noted no other capabilities affected by Plaintiff's impairment (Tr. 752). Therefore, I conclude the ALJ considered Mr. Harding's report in its entirety was reasonable in relying on his conclusions when forming his credibility and RFC findings. In fact, Mr. Hardison found at most, only slight limitations of function.

Plaintiff also cites to various excerpts from consultative examiner Dr. Long's report in support of her claim of greater limitation (Doc. 18, Plaintiff's Brief at 13-15). In August 2004, Dr. Long considered that, in spite of Plaintiff's low test scores, Plaintiff had worked with fast foods, had a driver's license, and could drive (Tr. 267). Further, on testing, Plaintiff scored in the malingering range (Tr. 268). Dr. Long opined that Plaintiff was a slow learner and always had been, but she was not quite as restricted as she tried to project (Tr. 267). I conclude Dr. Long's report did not support Plaintiff's claim of disability; but provided support for the ALJ's credibility and RFC finding (Tr. 18-20).

Plaintiff contends because Mr. Hardison reported IQ scores ranging from 54-64, and Dr.

Long reported IQ scores ranging from 54 to 59, that "[i]t seems somewhat incredulous that a person like [Plaintiff] could 'fake' the results of two tests given three years apart and achieve almost identical results." (Doc. 18, Plaintiff's Brief at 14). However, Plaintiff's argument assumes that the IQ scores were a valid and reliable indicator of her abilities. The ALJ did not believe them to be valid and reliable because Dr. Long and Mr. Hardison questioned them. Mr. Hardison determined that Plaintiff's IQ scores were likely an under representation of her true capabilities, and he diagnosed only an anxiety disorder and malingering (Tr. 747-49). Dr. Long determined that testing indicated Plaintiff was in the malingering range, and he diagnosed mixed moods, PTSD, personality pattern-avoidant/dependent, and only mild mental deficiency (Tr. 268). Despite Plaintiff's IQ scores, neither of mental health professionals considered Plaintiff's IQ scores to be a valid indicator of her intellectual functioning. Further, as the ALJ considered, Dr. Battles, a psychiatrist who treated Plaintiff in April and May 2004 reported that Plaintiff had average intelligence (Tr. 770).

Other evidence available to the ALJ was the opinion of Dr. VanderPlate, a state agency psychologist (Tr. 20). "State agency medical and psychological consultants and other program physicians and psychologists are highly qualified physicians and psychologists who are also experts in Social Security disability evaluation." 20 C.F.R. § 404.1527(f)(2)(I). In September 2004, Dr. VanderPlate reviewed the record and opined that, despite her borderline intellectual functioning and mixed mood disorder, Plaintiff had the ability to understand and remember at least simple instructions and carry out simple tasks with adequate concentration, although her pace may be slower (Tr. 273). She could relate appropriately to others, and her adaptive skills were intact (Tr. 273). In forming his opinion, Dr. VanderPlate considered Plaintiff's work

history as a waitress, her ability to read and write, as well as her consultative examination with Dr. Long (Tr. 273, 287). Dr. VanderPlate's opinion provided support for the ALJ's credibility and RFC findings.

Plaintiff cites to three assessments completed by "treaters" at VBHCS in November 2004, November 2005, and September 2006, to support her contention that she had at least "moderate" limitations in her mental ability to perform activities of daily living, interpersonal functions, task performance and pace, and adaptation to change (Doc. 18, Plaintiff's Brief at 10). The Commissioner questions who completed these assessments, arguing it is not clear whether the source or sources who completed the assessments were "treating sources" or even "acceptable medical sources" as described in 20 C.F.R. § 404.1513.

Even assuming the sources completing the assessments were treating sources as well as acceptable medical sources, the VBHCS records as a whole still provided support for the ALJ's conclusions. Clearly, the ALJ considered the records from VBHCS (*See* Tr. 19). Notably, the ALJ considered that the November 2004 assessment indicated that Plaintiff had a GAF of 55 and by April 2005, Plaintiff GAF score had increased to 60, at the upper end of the range of scores indicative of moderate symptoms (Tr. 19). Furthermore, according to the VBHCS treatment reports from June, August, September, and November 2005 and January, February, May, June, and September 2006, Plaintiff continued to be assessed with a GAF of 60, and it was noted that progress was being made towards her goals of improving depression and anxiety (Tr. 616, 619, 627, 629, 631, 636, 643, 739, 742, 737). The ALJ also considered that according to the assessment from September 2006, Plaintiff had only "mild" limitations in performing daily activities, in social interaction, and in concentration, task performance, and pace, and a

20

"moderate" limitation in the ability to adapt to changes in her life (Tr. 19, 732-33). Based on the records from VBHCS in addition to the opinions from Mr. Hardison, Dr. Long, and Dr. VanderPlate, I conclude the ALJ reasonably assessed Plaintiff's mental RFC.

Next, Plaintiff contends that the ALJ failed to provide specific reasons for his credibility finding. Doc. 18, Plaintiff's Brief at 17. Contrary to Plaintiff's contention, the ALJ considered Plaintiff's questionable effort at the psychological consultative examination with Mr. Hardison; validity testing suggested Plaintiff was exaggerating her symptoms and IQ testing was not considered to be valid (Tr. 747-78). Also, Dr. Long reported Plaintiff scored in the malingering range on testing (Tr. 268). In addition, the ALJ considered that Dr. Battles indicated that Plaintiff had average intelligence (Tr. 22, 770). Further, despite Plaintiff's assertions of disabling depression, reports from VBHCS indicated that Plaintiff's level of depression was not congruent with her rating of 9 on a scale of 0 to 10 (Tr. 630, 626). Also, reports from VBHCS indicated that Plaintiff was making progress towards her goals of reducing depression and anxiety (Tr. 616, 619, 627, 629, 636, 643, 739, 742, 737). In addition, as discussed above, the opinions of Mr. Hardison, Dr. Long, and Dr. VanderPlate all suggest that Plaintiff was not as limited as she claimed to be. The ALJ also considered that Plaintiff's complaints of pain were not credible (Tr. 22). Indeed, no physician of record indicated the level of physical limitation that Plaintiff alleged. Thus, contrary to Plaintiff's assertion, the ALJ did provide specific reasons for his credibility finding.

Looking at the record as a whole, I conclude the ALJ properly evaluated Plaintiff's allegations in accordance with controlling law, and reasonably conclude they were not fully credible. Because substantial evidence supports these findings, they will be affirmed. *See Casey*

*v. Secretary of Health & Human Servs.*, 987 F.2d 1230, 1234 (6th Cir. 1993) (absent compelling evidence to the contrary, ALJ's credibility findings should be accorded deference).

2. Next, Plaintiff argues substantial evidence does not support the ALJ's finding that Plaintiff could perform a significant number of jobs in the economy. In reaching the conclusion there were jobs Plaintiff could perform, the ALJ asked the VE to assume an individual of Plaintiff's age, marginal literacy, and who had no past relevant work experience (Tr. 793). The individual had PTSD, a mild cognitive impairment with an estimate of borderline intellectual functioning, a personality disorder, a mood disorder, and a GAF of 60 (Tr. 793). She had a mild impairment of daily activities, a mild impairment of concentration, and a mild impairment of her ability to function socially (Tr. 793). She had moderate difficulties adapting to changes and could not perform complex work or work requiring frequent changes in the work environment, in her duties, or in the environment in which she works (Tr. 793-94). Also, due to reduced hearing and slight speech impediment, she could not perform jobs where good communication orally, meaning speech or hearing, was required (Tr. 794). She had no other physical limitations (Tr. 793-74). The VE testified that such an individual could perform medium exertion, unskilled jobs as a hand packager, industrial cleaner, and machine cleaner (Tr. 794). She testified that there were 26,075 such jobs in the state and over a million in the nation (Tr. 794). Thus, based on the VE's testimony, the ALJ reasonably found that Plaintiff could perform a significant number of jobs in the economy. *See Cline v. Comm'r of Soc. Sec.*, 96 F.3d 146, 149-50 (vocational expert's testimony meets Commissioner's burden at step five of the sequential evaluation).

Plaintiff argues that the ALJ's hypothetical question to the VE did not accurately portray her mental limitations associated with her low IQ (Doc. 18, Plaintiff's Brief at 18-19). She states

that, when the VE at the supplemental hearing was asked to consider the impact if the individual had a general range of less than "borderline range" with an IQ in the range of 60 to 69, the VE stated that such an individual normally would not be able to complete and maintain a job at competitive employment (Doc. 18, Plaintiff's Brief at 19-20). However, the VE testified that, if the individual had an IQ range with the overall score of 54, normally such individual would not be able to compete and maintain a job at competitive employment (Tr. 814). In this case, however the ALJ determined the IQ scores were not valid, and that Plaintiff had borderline intellectual functioning. There is no indication by any medical source that Plaintiff had less than borderline intellectual functioning. Indeed, neither consultative examiner diagnosed mild mental retardation, nor did the treatment notes from VBHCS or Dr. Battles indicate such diagnosis. Therefore, the VE's response to Plaintiff's hypothetical question was immaterial. *See Casey*, 987 F.2d at 1235 ("It is well-established that an ALJ may pose hypothetical questions to a vocational expert and is required to incorporate only those limitations accepted as credible."). Here the ALJ's hypothetical question accurately portrayed the limitations supported by the evidence of record which the ALJ found to be credible. The VE's response provided substantial evidence to support the ALJ's finding that Plaintiff could perform a significant number of jobs. There is substantial evidence to support the conclusion reached by the ALJ that Plaintiff was not disabled.

<u>Conclusion</u>

Having carefully reviewed the administrative record and the briefs of the parties filed in support of their respective motions, I conclude that there is substantial evidence in the record to support the findings of the ALJ and the decision of the Commissioner denying the plaintiff's application for benefits. Accordingly, I RECOMMEND:

(1)     The plaintiff's motion for summary judgment (Doc. 17) be DENIED;

(2)     The defendant's motion for summary judgment (Doc. 19) be GRANTED;

(3)     A judgment be entered pursuant to Rule 58 of the Federal Rules of Civil Procedure AFFIRMING the Commissioner's decision which denied benefits to the plaintiff; and,

(4)     This action be DISMISSED.[5]

Dated:  February 11, 2009          s/William B. Mitchell Carter
                                    UNITED STATES MAGISTRATE JUDGE

---

[5]Any objections to this Report and Recommendation must be served and filed within ten (10) days after service of a copy of this recommended disposition on the objecting party.  Such objections must conform to the requirements of Rule 72(b) of the Federal Rules of Civil Procedure.  Failure to file objections within the time specified waives the right to appeal the District Court's order.  *Thomas v. Arn*, 474 U.S. 149, 88 L.Ed.2d 435, 106 S.Ct. 466 (1985).  The district court need not provide *de novo* review where objections to this report and recommendation are frivolous, conclusive and general.  *Mira v. Marshall*, 806 F.2d 636 (6th Cir. 1986).  Only specific objections are reserved for appellate review.  *Smith v. Detroit Federation of Teachers*, 829 F.2d 1370 (6th Cir. 1987).

24